671 S.E.2d 619

**STATE of South Carolina, Respondent,**

v.

**Rodney R. PARKER, Jr., Appellant.**

No. 4475.

Court of Appeals of South Carolina.

Heard Dec. 11, 2008.

Decided Dec. 23, 2008.

72

Robert M. Dudek, Deputy Chief Appellate Defender for Capital Appeals, of Columbia, for Appellant.

Attorney General Henry D. McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Senior Assistant Attorney General William Edgar Salter, III, all of Columbia; and Solicitor I. McDuffie Stone, III, of Beaufort, for Respondent.

ANDERSON, J.:

Rodney R. Parker, Jr., ("Parker") was convicted of the armed robbery of an Ashepoo grocery store and the murder of its employee, English Jack Savage. Parker confessed after being apprehended. He appeals his conviction arguing the trial judge erred ruling his confession was admissible and by denying his motion for a change of venue. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

The events leading up to Parker's confession occurred primarily on the night of December 26, 2003, and into the morning of December 27, 2003. Parker was wanted by law enforcement in connection to numerous crimes. Multiple agencies participated in the investigation and manhunt including the highway patrol, the South Carolina Law Enforcement Division, the Colleton County Sheriff's Department, and the Department of Alcohol, Tobacco and Firearms. The search utilized helicopters and two bloodhound units. Joe Boykin, an ATF agent who testified at the *Jackson v. Denno* hearing, became involved with the pursuit of Parker because many of the crimes committed were federal offenses.

Authorities were tipped off that Parker and his co-defendant, Jaquan Ferrell, had stolen a Mercedes Benz in Columbia and were traveling towards Colleton County. Interstate 95

was shut down for an hour causing a significant back-up of holiday traffic. The various law enforcement agencies created a command post by taking over a rest area. Parker and Ferrell were spotted in the car and crashed following a high speed chase. The pair fled into a wooded area and spent the night without shelter or warm clothing as the temperature dipped below freezing.

Early the next morning, Parker and Ferrell were seen running across a dirt road. Boykin, Investigator Philip Roberson and Officer Hampton Jenkins, both with the Colleton County Sheriff's Department, responded to the area. They eventually observed Parker lying on the ground with his hands under his body. Despite being commanded to "show us your hands," Boykin testified Parker refused to obey. After Roberson discharged a warning shot, Parker jumped up and ran away. Roberson and Jenkins both fired as he fled. Boykin opined Roberson was shooting to kill. Soon after, bloodhounds tracked Parker and he was tackled during a foot chase.

When Parker was apprehended, Boykin estimated there were approximately thirty agents and officers on the scene. Boykin asked Parker if he was okay and whether he needed a doctor. Parker only complained of being cold and was placed in the back of a heated police car. Boykin noted that Parker was angry with Roberson for having tried to shoot him. He inquired whether Parker would be willing to speak with him and if he wanted his father present. Parker responded affirmatively to both questions. After being examined and treated at the hospital, Parker confessed at the sheriff's department. The majority of his oral confession was videotaped. A jury found him guilty, and he was sentenced to life imprisonment for murder and thirty years imprisonment for armed robbery.

## *ISSUES*

(1) Did the trial court err in determining Parker's statement was admissible?

(2) Did the trial court err in denying Parker's motion to change venue due to pretrial publicity?

74

## STANDARD OF REVIEW

■■■ In criminal cases, the appellate court sits to review errors of law only. *State v. Baccus,* 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006); *State v. Wilson,* 345 S.C. 1, 545 S.E.2d 827 (2001); *State v. Wood,* 362 S.C. 520, 608 S.E.2d 435 (Ct.App.2004). This court is bound by the trial court's factual findings unless they are clearly erroneous. *State v. Quattlebaum,* 338 S.C. 441, 527 S.E.2d 105 (2000); *State v. Amerson,* 311 S.C. 316, 428 S.E.2d 871 (1993); *State v. Landis,* 362 S.C. 97, 606 S.E.2d 503 (Ct.App.2004).

■■■ The trial judge determines the admissibility of a statement upon proof of its voluntariness by a preponderance of the evidence. *State v. Miller,* 375 S.C. 370, 378, 652 S.E.2d 444, 448 (Ct.App.2007) (citing *State v. Washington,* 296 S.C. 54, 55, 370 S.E.2d 611, 612 (1988); *State v. Smith,* 268 S.C. 349, 354, 234 S.E.2d 19, 21 (1977)); *State v. Arrowood,* 375 S.C. 359, 365, 652 S.E.2d 438, 441 (Ct.App.2007). If admitted, the jury must then determine whether the statement was given freely and voluntarily beyond a reasonable doubt. *Washington,* 296 S.C. at 55–56, 370 S.E.2d at 612.

■■■ "Factual conclusions as to the voluntariness of a statement will not be disturbed on appeal unless so manifestly erroneous as to show an abuse of discretion." *Arrowood,* 375 S.C. at 365, 652 S.E.2d at 441; *Baccus,* 367 S.C. at 48, 625 S.E.2d at 220; *State v. Saltz,* 346 S.C. 114, 551 S.E.2d 240 (2001); *State v. Kennedy,* 333 S.C. 426, 429, 510 S.E.2d 714, 715 (1998); *State v. Von Dohlen,* 322 S.C. 234, 242, 471 S.E.2d 689, 695 (1996). "In criminal cases, appellate courts are bound by fact finding in response to preliminary motions where there has been conflicting testimony or where the findings are supported by the evidence and not clearly wrong or controlled by an error of law." *State v. Asbury,* 328 S.C. 187, 193, 493 S.E.2d 349, 352 (1997) (citing *State v. Amerson,* 311 S.C. at 320, 428 S.E.2d at 873); *State v. Franklin,* 299 S.C. 133, 138, 382 S.E.2d 911, 914 (1989). "When reviewing a trial court's ruling concerning voluntariness, this Court does not reevaluate the facts based on its own view of the preponderance of the evidence, but simply determines whether the trial court's ruling is supported by any evidence." *Saltz,* 346 S.C. at 136, 551 S.E.2d at 252; *State v. Breeze,* 379 S.C. 538, 543, 665

S.E.2d 247, 250 (Ct.App.2008); *Miller,* 375 S.C. at 378–79, 652 S.E.2d at 448.

## LAW/ANALYSIS

### I. *In camera* Hearing and Ruling on Oral and Transcribed Statements.

■ Parker argues the trial court erred in ruling his statement was admissible because he: (1) was a minor, (2) was examined at a hospital after being apprehended, (3) spent the night outdoors in the cold, (4) was shot at by police, (5) spent three and a half hours being interviewed, (6) confessed to an agent who admittedly sought to manipulate him, and (7) because his father "aided the police." After examining the record, we disagree.

■ "A criminal defendant is deprived of due process if his conviction is founded, in whole or in part, upon an involuntary confession." *State v. Pittman,* 373 S.C. 527, 565, 647 S.E.2d 144, 164 (2007) (citing *Jackson v. Denno,* 378 U.S. 368, 377, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964)), *cert. denied,* —— U.S. ——, 128 S.Ct. 1872, 170 L.Ed.2d 751 (2008). In *State v. Miller,* this court instructed:

> The process for determining whether a statement is voluntary, and thus admissible, is bifurcated; it involves determinations by both the judge and the jury. First, the trial judge must conduct an evidentiary hearing, outside the presence of the jury, where the State must show the statement was voluntarily made by a preponderance of the evidence. *Jackson v. Denno,* 378 U.S. 368, 376, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). If the statement is found to have been given voluntarily, it is then submitted to the jury, where its voluntariness must be established beyond a reasonable doubt. *State v. Washington,* 296 S.C. 54, 56, 370 S.E.2d 611, 612 (1988).

*Miller,* 375 S.C. at 380, 652 S.E.2d at 448; *Arrowood,* 375 S.C. at 366, 652 S.E.2d at 442. *See also Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 ("[T]he prosecution must prove ... by a preponderance of the evidence that the confession was voluntary."); *State v. Smith,* 268 S.C. 349, 354, 234 S.E.2d 19, 21 (1977) ("It has been uniformly held, a

confession may be introduced upon proof of its voluntariness by a preponderance of the evidence."); *State v. Neeley,* 271 S.C. 33, 40, 244 S.E.2d 522, 526 (1978) ("[T]he burden is on the State to prove by a preponderance of the evidence that [these] rights were voluntarily waived.").

Upon motion of the defense counsel, the trial judge held a pretrial *Jackson v. Denno* hearing to determine the admissibility of Parker's oral and written statements. The State presented ATF Agent Joe Boykin and three members of the Colleton County Sheriff's Department: Investigator Philip Roberson, former investigator Leslie Jamison, and Investigator Angela McAllister Stallings. The judge viewed the videotaped portion of the oral confession.

Boykin told the trial judge details concerning how he, as a federal agent, came to be involved in the investigation and manhunt. He explained he, Roberson and Jenkins spotted Parker in the woods, ordered him to show his hands, and that shots were fired as he ran. Parker was eventually tackled, handcuffed and placed in a heated police car. In Roberson's presence, Boykin read Parker his *Miranda* warnings. At the time, Parker's main complaint was that he was cold. Boykin estimated the arrest occurred at seven or eight o'clock in the morning.

Parker's *Miranda* warnings were given by Boykin a second time at the sheriff's department prior to the questioning, but Boykin had no knowledge that a written waiver form was provided. The videotaping was not initiated until fifteen to twenty minutes after Parker had been placed in the interview room because the equipment was locked in an adjoining office. Boykin discussed only "generalities" as they waited for Parker's father to arrive. When asked to describe Parker's physical appearance at the sheriff's office, Boykin explained:

Tired. He had been in the woods all night long. It was cold that night. But he was certainly more comfortable at that point and time than he had been, because it was a cold night. And also he had been scared. He had been, you know, hiding from police all night long. But he seemed to be calm. Or calm, much more calm than having been in the woods all night and with his apprehension that occurred previously. And I mean, we spoke easily to each other. He

didn't seem apprehensive to talk to me. I was very kind to him. And spoke respectfully to him.

. . .

And I inquired as to his condition. If he was okay. He said he was. He was just tired. He had some cuts and some dings from, you know, running through the woods the night before. And I had inquired earlier if he would like to see his father. And have his father there. And he said yes. So I made arrangements to get Mr. Parker, Sr. to come to the sheriff's department.

Boykin knew Parker had spent time with the Department of Juvenile Justice, but was unaware of his intellectual capacity or level of education. He said Parker spoke coherently and did not appear to be under the influence of alcohol or intoxicants. When Boykin asked if he wanted an attorney, "[Parker] said no. He said he was fine. He responded that he would agree to be interviewed. And I asked him did he want his father there and he said, yes." Boykin denied being coercive or threatening. He did not make any representations that Parker would be tried as a juvenile or an adult or receive a life sentence unless he spoke. Although Boykin admitted he did not serve the State's arrest warrants for murder or armed robbery, he remembered telling Parker he was arrested under state charges, not federal, and was being charged with the grocery store robbery. Because the taped confession lasted at least an hour and a half, adding on the fifteen to twenty minutes missed before the video equipment was activated, Boykin estimated his interview lasted nearly two hours.

At the *Denno* hearing, Boykin was cross-examined concerning his interrogation techniques:

Q: Isn't it true that the particular technique that you use is called the [Reid] technique?

A: I have heard of the [Reid] technique. I've never been specifically instructed in the [Reid] technique. I think that's a school, it's an advanced school. I've never gone to it. But I am familiar with it. I mean, I've familiar with some of the, you know, fundamentals I guess. My— I mean, my way of interviewing is I always try to be nice to folks, you know, and treat them with respect. And I

find for me that gets me a lot further in talking to folks than being belligerent or condescending.

Q: Isn't it true, Agent Boykin, that the [Reid] technique involves breaking the defendant down first of all? And then after breaking him down, then you give him some moral justification or rationalization? You kind of back him into a corner and break him down. And then you back him into a corner with the, you know, showing him the pictures and the evidence like you did between the two.

A: I am not sure if that's all part of the [Reid] technique per se.

Q: And then you give him a morally justified reason for what you're accusing him of doing.

A: I use that as a technique personally. I use the expression of giving somebody an out. I mean that's what you're saying basically.

Q: That's part of—

A: It's hard for somebody to admit when they've done something wrong without any justification. And so a lot of times when I interview folks, I try to craft my questioning in such a way that, you know, if they want to admit they've done something wrong, to help them make that admission.

Q: Isn't it true, Agent Boykin, and when you said, "Rodney [ ] I know you didn't mean to—

A: Right, I did say that.

Q: —to shoot Mr. Savage. I know you didn't mean to kill him."

A: Right.

Q: "I know you must have been nervous. I know you must have been scared you were going to get shot by all that."

A: Yes, sir.

Q: That was a deceptive [Reid] technique that is used to try to involuntarily gain a confession, isn't that right?

A: I don't know about the [Reid] technique per se. But, I mean, I did say that. And I did say it with the hopes that I could give Mr. Parker a platform if you will, to admit

that he shot Mr. Savage. And I thought it would be easier for him to come out with the admission if he thought that I thought there was some justification for it. And that he was not the bad guy that he had been portrayed or perceived to be; that maybe there was a reason that he shot him. Maybe, you know, maybe he was scared. Maybe he was upset. Maybe Mr. Savage did something that frightened him or upset him and made him shoot. But when I do interviews, you know, I try to create an environment for someone to be comfortable with me, to want to talk to me. And in effect, get if off their chest and have an opportunity to unload.

And that's what I was trying to do with Mr. Parker when I interviewed him, is try to put him at ease, and try to give him an out, if you will, to make that admission. And that's certainly accurate.

Investigator Roberson was with Boykin on December 27, 2003, when Parker was given his *Miranda* warnings in the back of the police car. He first became involved with the investigation after being called to the grocery store the night of the robbery and shooting. He worked extensively on the case until Parker was arrested. Roberson participated in the car chase but his vehicle was unable to keep up. He told the trial judge another officer, Captain Buddy Hill, shot out the Mercedes' windows and tires prior to the wreck.

Roberson's testimony about the efforts made to find Parker in the woods and the subsequent arrest corroborated that of Boykin. After spotting Parker, Roberson said he refused to show his hands leading him to believe he had a gun. He admitted firing twenty-eight rounds as Parker ran away. Roberson never interviewed Parker, but, immediately after his arrest, "talked to him to see how—what kind of mind set he was in so I would know what we were dealing with when we were transporting him." He denied telling Parker that he would go to jail for the rest of his life.

Leslie Jamison, an investigator with the Colleton County Sheriff's Department at the time of Parker's arrest, was the case officer in the murder and armed robbery investigation. She was with Boykin at the department when he advised Parker of his *Miranda* rights and conducted the interview.

Jamison agreed no written waiver of Parker's *Miranda* rights was prepared. She stated: (1) neither she nor Boykin used threats, coercion, or promises, (2) Parker appeared to understand the questions asked during the interview, (3) he did not appear to be under the influence of intoxicants or alcohol, and (4) he did not appear injured. To the best of her knowledge, Parker's statement was given freely and voluntarily.

Jamison explained the arrest warrants were not served until January 9, 2004, because Parker was a minor and her supervisor told her to wait. She confirmed Boykin talked to Parker subsequent to the hospital visit and asked if he wanted his father present. She denied speaking with Parker about his father. Jamison disagreed that Parker was interviewed the afternoon following his arrest because he was at a vulnerable point. Taking into consideration that Parker had experienced a car crash, been shot at, and spent a night in the cold, Jamison opined Parker had spent other nights in the woods and been pursued by law enforcement on previous occasions. She did not tell Parker exactly what he was charged with or the penalties involved. Although she was aware there would be an attempt to try Parker as an adult, she did not communicate this information to him. She knew of Parker's education level but not that of his father.

Colleton County Sheriff's Department Investigator Angela McAllister Stallings took Parker's written statement following his interview with Boykin. She testified she transcribed the statement as Parker spoke and, if he spoke too fast, she would ask him to "hold on." Although unable to remember why she wrote the statement rather than Parker, she asserted the practice was not unusual. She confirmed Parker and Ferrell were taken to the hospital to be checked for hypothermia after their arrest and prior to their arrival at the sheriff's department. One of them had a foot checked for frostbite.

Stallings averred Jamison and Boykin gave Parker his *Miranda* warnings, but admitted she was not present either time. With custodial interviews Stallings initiates, she usually has a written waiver form but conceded none was provided to Parker. The written statement began at 3:40 p.m. and concluded at 5:40 p.m. She did not recall Parker crying or

hanging his head. The written statement, which Stallings read at the *Denno* hearing, declared:

[Ferrell] picked me up in a gray ford taurus. It had Orangeburg paper tags on it. I thought it was a rental car. We came back to Colleton County. We went to Greed Pond and parked at Wood's store. We were in the ford taurus. We walked from Wood's store to Ashepoo Grocery. We walked behind the store. We came up on the south side of the building and stood there for awhile to wait for the least amount of cars in the parking lot. We went inside. I went behind the cash register and pointed the gun at Jack and [Ferrell] pointed his gun at a customer. I told Jack to open up the cash register and he started yelling the name Lucious. I got scared when he started yelling for him. Before we went in, [Ferrell] said if he called Lucious, he would come out and shoot us. He walked towards me and I backed up and the gun went off. He started backing up. I grabbed the register and ran. As [Ferrell] was watching the customer, his gun fell apart. After I took the register, we ran out and went left, ran behind the store and ran back through the field to the car and pulled out on the highway and went right.

Yesterday we came to Walterboro in the white Benz. A black jeep was following us so I pulled off the road. We got to the interstate and got on and saw all the black and golds. I pulled over and the black and gold pulled in behind me and turned the blue lights on. [Ferrell] said go-go and I took off. A man shot at me and caused me to wreck. We jumped out and ran into the woods. We went and hid and went to sleep. This morning we got up and was walking out when [Ferrell] saw the cop car. We ran back in the woods and split up. They found us and one shot at me. We ran to another and there were cops there with dogs, and they got us. This statement was written by Detective McAllister for Rodney Parker.

Parker testified at the *Denno* hearing. He was sixteen-years-old at the time of arrest, had completed the sixth grade, spent four years in the Department of Juvenile Justice, and said he had an I.Q. of eighty-four. His writing and spelling ability were "all right." In a discussion of the events leading up to his arrest, he explained the Mercedes Benz crashed

after an officer shot the car's windows and tires. He was not wearing a seatbelt and sustained "a big gash on my right arm at the top." He and Farrell ran into the woods and "alluded [sic] the bloodhounds by running through water." They slept very little that night and stayed warm by huddling. As a result of the cold, Parker said he had frostbite. During the manhunt, he was scared because "it was already evident that they were shooting to kill even though I wasn't armed." He explained:

> A: I got trapped off. So I was on the ground but one of my arms was caught in my sleeve. And I was trying to pull it out. So another officer was telling me to freeze. I guess I thought he was going to shoot, because he probably thought I had a gun and I ain't had no gun.

After being arrested, Parker did not ask for medical assistance or for his father, though he agreed he wanted his father when Boykin made the suggestion. He maintained no one told him he had the right to have an attorney present, the right to remain silent, nor that anything he said could be used against him in court. He confirmed never having been presented with a written waiver of his *Miranda* rights.

Parker said he was treated at the hospital for hypothermia and frostbitten feet. The hospital discharge paper, which reported he was treated for neck muscle strain and abrasions, recorded that Parker left the facility at 1:35 p.m. The interrogation process began immediately upon his arrival at the sheriff's department. Parker asserted that he was questioned for two or three hours before the recording equipment was turned on. However, he agreed he was first interviewed and then the written statement began at 3:40 p.m. On re-direct examination he responded affirmatively when his counsel asked, "So what you're saying is, you were questioned about 2 hours before the tape started, which is really not out of line, is it? With the total time of 3 and a half hours?" He contended he was crying uncharacteristically and was "pretty sure [he] was stressed out, emotionally disturbed." Before the tape came on, Parker complained Boykin told him he could get life in prison:

> Q: Did he ever threaten you in any way about that?

A: He never threatened me. He just was like, you know, the type of time you are facing. If you don't tell us this, if you don't tell us that, we are going to give you life in prison, stuff like that.

Parker testified he did not know what he was charged with until January 9, 2004, when the warrants were served. His father arrived approximately twenty minutes after the questioning began but never spoke to him privately, recommended getting an attorney, nor advised him not to talk to the police.

After the *Denno* hearing, Parker moved to suppress the statement. The trial judge denied the motion and determined:

On the question of voluntariness of the defendant's statement, I put a significantly different interpretation on the evidence than that which was argued by [Parker's counsel]. And there are four questions that I have to answer. The first is, did the defendant make this statement. I find the State has proven by the preponderance of the evidence that he did. The second question is whether or not he was administered his *Miranda* warnings before he was questioned by law enforcement. And I find that the State has proven by the preponderance of the evidence that he was. And in doing so, I specifically find that the defendant's testimony on the subject of whether or not he was advised of his right to counsel and given his other *Miranda* warnings is not credible.

The third question is did he knowingly and intelligently waive his constitutional rights. And the answer to that question is that the State has proven by the preponderance of the evidence that he did. It was argued that there was a way in which the defendant had attempted to invoke his right to counsel by asking for his father or in some other way. I find specifically that at no point during the period of time leading up to the statement that was given by the defendant, that has been admitted into evidence for purposes of the Miranda—of the *Jackson v. Denno* as exhibit No. 1.

. . .

At no point prior to that statement did the defendant invoke his right to counsel. And then the fourth question is, was the statement given voluntarily. And I find that the State

84

has proven by the preponderance of the evidence that the answer to that question is yes. So the State to sum it up, the State has proven by the preponderance of the evidence that the answer to each of those four questions is yes. The statement is therefore admissible. And of course it will be up to the jury to determine whether or not the State has proven the same answers to each of those questions beyond a reasonable doubt.

Questioning suspects "is often indispensable to crime detection. Its compelling necessity has been judicially recognized as its sufficient justification, even in a society which, like ours, stands strongly and constitutionally committed to the principle that persons accused of crime cannot be made to convict themselves out of their own mouths." *Culombe v. Connecticut*, 367 U.S. 568, 571, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961). However:

A statement obtained as a result of custodial interrogation is inadmissible unless the suspect was advised of and voluntarily waived his or her rights under *Miranda v. Arizona*, 384 U.S. 436, 498–99, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *See also State v. Saltz*, 346 S.C. 114, 136, 551 S.E.2d 240, 252 (2001). If a suspect is advised of his *Miranda* rights, but chooses to make a statement, the burden is on the State to prove by a preponderance of the evidence that his rights were voluntarily waived. *Saltz*, 346 S.C. at 136, 551 S.E.2d at 252; *State v. Rochester*, 301 S.C. 196, 200, 391 S.E.2d 244, 247 (1990); *Washington*, 296 S.C. at 54, 370 S.E.2d at 611.

*Arrowood*, 375 S.C. at 366–67, 652 S.E.2d at 442; *see also Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (*Miranda* waiver must be voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception."); *accord Colorado v. Spring*, 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987).

Under *Jackson v. Denno*, a defendant is entitled to a "reliable determination as to the voluntariness of his [statement] by a tribunal other than the jury charged with deciding his guilt or innocence." *State v. Fortner* 266 S.C. 223, 226, 222 S.E.2d 508, 510 (1976); *Miller*, 375 S.C. at 381, 652 S.E.2d at 450. "Once the trial judge determines that the

statement is admissible, it is up to the jury to ultimately determine, beyond a reasonable doubt, whether the statement was voluntarily made." *Miller*, 375 S.C. at 383, 652 S.E.2d at 451 (citing *State v. Von Dohlen*, 322 S.C. 234, 243, 471 S.E.2d 689, 695 (1996)). "In South Carolina, the judge makes this initial determination of voluntariness required by *Jackson v. Denno*." *Fortner*, 266 S.C. at 226, 222 S.E.2d at 510.

In *State v. Pittman*, 373 S.C. 527, 647 S.E.2d 144 (2007), our supreme court recently instructed:

> In determining whether a confession was given "voluntarily," this Court must consider the totality of the circumstances surrounding the defendant's giving the confession. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). As the United States Supreme Court has instructed, the totality of the circumstances includes "the youth of the accused, his lack of education or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." *Id.* (internal citations omitted). Furthermore, no one factor is determinative, but each case requires careful scrutiny of all the surrounding circumstances. *Id.*

*Pittman*, 373 S.C. at 566, 647 S.E.2d at 164. *See also Arizona v. Fulminante*, 499 U.S. 279, 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (applying totality of the circumstances test to determine confession's voluntariness); *State v. Myers*, 359 S.C. 40, 47, 596 S.E.2d 488, 492 (2004) ("A determination whether a statement was 'given voluntarily requires an examination of the totality of the circumstances.'" (quoting *Von Dohlen*, 322 S.C. at 243, 471 S.E.2d at 694–95)); *State v. Peake*, 291 S.C. 138, 139, 352 S.E.2d 487, 488 (1987) ("The test for determining the admissibility of a statement is whether it was knowingly, intelligently, and voluntarily given under the totality of the circumstances.") (citing *State v. Rabon*, 275 S.C. 459, 272 S.E.2d 634 (1980)); *Arrowood*, 375 S.C. at 367, 652 S.E.2d at 442 ("The trial judge's determination of the voluntariness of the statement must be made on the totality of the circumstances, including the background, experience, and conduct of the accused.").

■■ Statements of juveniles are reviewed under the totality of the circumstances. In *Fare v. Michael C.*, 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979), the United States Supreme Court held a juvenile's request for his probation officer was a not *per se* invocation of his *Miranda* rights. Rather, the efficacy of his waiver should have been determined by considering all the circumstances surrounding the interrogation. Specifically, the Court expounded:

This totality-of-the circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved. We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so. The totality approach permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.

*Id.* at 725, 99 S.Ct. 2560. *See also In re Williams*, 265 S.C. 295, 299, 217 S.E.2d 719, 722 (1975) ("While the age of the individual is a factor to be taken into consideration, the admissibility of a statement or confession of a minor depends upon its voluntariness, to be determined from the totality of the circumstances under which it is made.")

Multiple factors are considered when deciding whether a statement was made voluntarily. In *Miller*, this court observed:

The Supreme Court, in *Withrow v. Williams*, 507 U.S. 680, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993), set forth a nonexclusive list of factors which may be considered in the totality-of-the-circumstances analysis:

Under the due process approach ... courts look to the totality of circumstances to determine whether a statement was voluntary. Those potential circumstances include not only the crucial element of police coercion, *Colorado v. Connelly*, 479 U.S. 157, 167, [107 S.Ct. 515, 93 L.Ed.2d 473] (1986); the length of the interrogation,

*Ashcraft v. Tennessee,* 322 U.S. 143, 153–154, [64 S.Ct. 921, 88 L.Ed. 1192] (1944); its location, see *Reck v. Pate,* 367 U.S. 433, 441, [81 S.Ct. 1541, 6 L.Ed.2d 948] (1961); its continuity, *Leyra v. Denno,* 347 U.S. 556, 561, [74 S.Ct. 716, 98 L.Ed. 948] (1954); the defendants maturity, *Haley v. Ohio,* 332 U.S. 596, 599–601, [68 S.Ct. 302, 92 L.Ed. 224] (1948) (opinion of Douglas, J.); education, *Clewis v. Texas,* 386 U.S. 707, 712, [87 S.Ct. 1338, 18 L.Ed.2d 423] (1967); physical condition, *Greenwald v. Wisconsin,* 390 U.S. 519, 520–521, [88 S.Ct. 1152, 20 L.Ed.2d 77] (1968) (*per curiam* ); and mental health, *Fikes v. Alabama,* 352 U.S. 191, 196, [77 S.Ct. 281, 1 L.Ed.2d 246] (1957). They also include the failure of police to advise the defendant of his rights to remain silent and to have counsel present during custodial interrogation. *Haynes v. Washington,* 373 U.S. 503, 516–517, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963)[.]

507 U.S. at 693–94, [113 S.Ct. 1745].

Appellate entities in South Carolina have recognized that appropriate factors to consider in the totality-of-circumstances analysis include: background, experience, and conduct of the accused; age; length of custody; police misrepresentations; isolation of a minor from his or her parent; threats of violence; and promises of leniency. *See Childs,* 299 S.C. at 475, 385 S.E.2d at 842 (background, experience, and conduct of the accused); *In re Williams,* 265 S.C. 295, 217 S.E.2d 719 (1975) (age); *State v. Jennings,* 280 S.C. 62, 309 S.E.2d 759 (1983) (length of custody); *State v. Rabon,* 275 S.C. 459, 461, 272 S.E.2d 634, 635 (1980) (police misrepresentations); *State v. Smith,* 268 S.C. 349, 355, 234 S.E.2d 19, 21 (1977) (isolation of minor); *State v. Rochester,* 301 S.C. 196, 200, 391 S.E.2d 244, 246 (1990) (threats of violence and promises of leniency).

*Miller,* 375 S.C. at 385–86, 652 S.E.2d at 452. *See also Michael C.,* 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (considering a sixteen-year-old's prior arrests and time spent in juvenile camp as a factor in whether he understood consequences of waiving *Miranda* rights); *State v. Doby,* 273 S.C. 704, 709, 258 S.E.2d 896, 899 (1979) (mental capacity); *State v. Cannon,* 260 S.C. 537, 544, 197 S.E.2d 678, 680–81 (1973) (age, education level, manner of police questioning).

Parker contends his confession was involuntary based on the following circumstances: (1) his age; (2) Agent Boykin sought to minimize Parker's sense of responsibility in getting him to confess; (3) his father "aided the police in obtaining a confession rather than serve the parental protective function;" (4) he spent a cold night outdoors and was taken to the hospital upon arrest; (5) police shot at him; and (6) he was subjected to an interrogation lasting three and one half hours.

■■■ Parker was sixteen-years-old at the time of his arrest and confession. The United States Supreme Court has "emphasized that admissions and confessions of juveniles require special caution." *In re Gault*, 387 U.S. 1, 45, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). "Although, courts have given confessions by juveniles special scrutiny, courts generally do not find a juvenile's confession involuntary where there is no evidence of extended, intimidating questioning or some other form of coercion." *Pittman*, 373 S.C. at 568, 647 S.E.2d at 165.

In *Haley v. Ohio*, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224, and again in *Gallegos v. Colorado*, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962), the United States Supreme Court reversed juvenile convictions on the grounds that the confessions were involuntarily gathered. Though the court addressed the scrutiny applied to juveniles' confessions with quite broad language in each opinion, it is firmly established that "a minor has the capacity to make a voluntary confession ... without the presence or consent of counsel or other responsible adult, and the admissibility of such a confession depends not on his age alone but on a combination of that factor with such other circumstances as his intelligence, education, experience, and ability to comprehend the meaning and effect of his statement." *Jenkins v. State*, 265 S.C. 295, 300, 217 S.E.2d 719, 722 (1975); . . . .

*Id.* at 566–67, 647 S.E.2d at 164–65 (confession of a twelve-year-old voluntary and admissible when he failed to show he did not understand his rights, was of such low intelligence that he could not have understood, and presented no evidence of prolonged detention, lengthy interrogation, deprivation of sleep or food, or coercive or improper police conduct). *See also In re Christopher W.*, 285 S.C. 329, 329 S.E.2d 769 (1985) (confession of eleven-year-old who had prior experiences with

police was voluntary when he was taken into custody at 10:00 p.m., made to swear his innocence on a bible, and confessed at 8:00 a.m. the next morning). *Cf. Thomas v. State,* 447 F.2d 1320, 1321–22 (4th Cir.1971) (confession of fifteen-year-old involuntary because he did not finish fifth grade, had an IQ of 72, was taken into custody around midnight, questioned until 4:30 a.m. and from 7:30 a.m. until 5:00 p.m. by a rotating team of officers, his parents were not informed of his arrest, and defendant driven to crime scenes while being questioned).

Parker cites Agent Boykin's interview technique of feigned sympathy and rationalization as a factor indicating his statement was not given voluntarily.

"Few criminals feel impelled to confess to the police purely of their own accord without any questioning at all. . . . Thus, it can almost always be said that the interrogation caused the confession. . . . It is generally recognized that the police may use some psychological tactics in eliciting a statement from a suspect. . . . These ploys may play a part in the suspect's decision to confess, but so long as that decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary."

*Von Dohlen,* 322 S.C. at 244, 471 S.E.2d at 695 (quoting *Miller v. Fenton,* 796 F.2d 598, 604–05 (3d Cir.1986)).

"Excessive friendliness on the part of an interrogator can be deceptive. In some instances, in combination with other tactics, it might create an atmosphere in which a suspect forgets that his questioner is in an adversarial role, and thereby prompt admissions that the suspect would ordinarily only make to a friend, not to the police." *Miller v. Fenton,* 796 F.2d at 604 (3d Cir.1986), *cert. denied,* 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986). "Nevertheless, the 'good guy' approach is recognized as a permissible interrogation tactic." *Id.* (holding confession admissible despite interrogating officer's "supportive, encouraging manner . . . aimed at winning [appellant's] trust and making him feel comfortable about confessing."). *See also Beckwith v. United States,* 425 U.S. 341, 343, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976) (interrogator had sympathetic attitude but confession voluntary); *Frazier v. Cupp,* 394 U.S. 731, 737–38, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (confession voluntary when petitioner began confessing

after the officer "sympathetically suggested that the victim had started a fight.").

In addition to the interrogator playing the "good guy," courts have permitted, though disfavored, other forms of deception when obtaining confessions. "Both this Court and the United States Supreme Court have recognized that misrepresentations of evidence by police, although a relevant factor, do not render an otherwise voluntary confession admissible ... The pertinent inquiry is, as always, whether the defendant's will was 'overborne.'" *Von Dohlen*, 322 S.C. at 243, 471 S.E.2d at 695. In *State v. Register*, 323 S.C. 471, 478–80, 476 S.E.2d 153, 158–59 (1996), our supreme court advised:

A statement may be held involuntary if induced by threats or violence, or if obtained by any direct or implied promises, or if obtained by the exertion of improper influence. *State v. Rochester*, 301 S.C. 196, 391 S.E.2d 244 (1990). However, this Court and the United States Supreme Court have held that misrepresentations of evidence by police, although a relevant factor, do not render an otherwise voluntary confession inadmissible. *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (confession voluntary despite police misrepresentation that associate had confessed); *State v. Rabon*, 275 S.C. 459, 272 S.E.2d 634 (1980) (confession voluntary despite police misrepresenting the evidence that had been accumulated); Furthermore, a defendant's will is not overborne when police misrepresent the facts leading him to believe that information of his guilt is greater than it actually is. *Ledbetter v. Edwards*, 35 F.3d 1062 (6th Cir.1994), *cert. denied*, 515 U.S. 1145, 115 S.Ct. 2584, 132 L.Ed.2d 833 (1995) (defendant's will was not overborne when police misrepresented the evidence convincing him to confess); *State v. Von Dohlen*, 322 S.C. 234, 471 S.E.2d 689 (1996) (record failed to establish that defendant's will was overborne by police misrepresentation of evidence rendering his confession involuntary).

*Register*, 323 S.C. at 478–80, 476 S.E.2d at 158–59 (confession voluntary and admissible despite police misrepresentation that appellant had been seen with victim, tire and shoe impressions at the murder scene were a match, and DNA evidence established guilt); *see also, Gallegos v. Colorado*, 370 U.S. 49, 82

S.Ct. 1209, 8 L.Ed.2d 325 (1962) (confession obtained in violation of due process when fourteen-year-old boy held five days without officers sending for parents, lawyer or other adult friend and without bringing him immediately before judge); *United States v. Mendoza–Cecelia*, 963 F.2d 1467, 1475 (11th Cir.1992) ("Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces confession.... Isolated incidents of police deception ... and discussions of realistic penalties for cooperative and non-cooperative ... are normally insufficient to preclude free choice.") *abrogated on other grounds, Coleman v. Singletary*, 30 F.3d 1420 (11th Cir.1994) (citations omitted); *State v. Myers*, 359 S.C. 40, 47, 596 S.E.2d 488, 492 (2004) (holding defendant's confession voluntary and admissible after police told him his hair was found clutched in victim's hand because "[e]ven if information were untrue, it is not, alone, enough to render the confession involuntary."); *State v. Peake*, 291 S.C. 138, 139, 352 S.E.2d 487, 488 (1987) ("A statement induced by a promise of leniency is involuntary only if so connected with the inducement as to be a consequence of the promise."); *Rabon*, 275 S.C. at 461, 272 S.E.2d at 635 ("A misrepresentation, while relevant, may be insufficient to render inadmissible an otherwise valid confession."). Here, there is no indication Parker's will was overborne by Agent Boykin's congenial and rationalizing interview.

Parker contends another factor lending to the involuntariness of his statement was his father's advice given at the interview, and in the presence of law enforcement, to tell him "what happened." Before apprehending Parker, Boykin had met his parent. He permitted authorities to search Parker's bedroom. When asked if he realized Parker's father had only an eighth grade education, Boykin explained he knew him to be "street smart" and "a grown man." In their previous conversations, Boykin found him comprehensible and responsive to his questions. Boykin admitted he thought the father's presence would aid in the questioning. But, he further reflected, "[h]is father could have very well said, you know, don't talk to these people.... I had no way of knowing what Mr. Parker, Sr.'s demeanor was going to be." The parties agreed

the father was upset or disappointed with Parker. At the *Denno* hearing, Parker's counsel claimed:

> [Parker's] father was actually acting as an agent for the state, in helping elicit a confession and a statement from his son because he was ticked off.... I mean the purpose of bringing somebody's parent in is to protect the rights of the juvenile, not to help get an involuntary statement from them.... [T]here are some cases which discuss, I don't know if they're right exactly on point. But it's certainly been argued that when you bring somebody's parent in or trusted adult, or person of that nature, that that's tantamount to asking for legal counsel. It's not the same thing because this person is not trained as an attorney. But if you ask somebody, do you want your father here and they say yes and he's a juvenile, that's saying that he didn't want to talk to the police.

██ A juvenile's request for a parent may be considered when determining the voluntariness of his confession. *Register*, 323 S.C. at 477, 476 S.E.2d at 157 (1996). In *Michael C.*, the United States Supreme Court elucidated:

> Where the age and experience of a juvenile indicate that his request for ... his parents is, in fact, an invocation of his right to remain silent, the totality approach will allow the court the necessary flexibility to take this into account in making a waiver determination. At the same time, that approach refrains from imposing rigid restraints on police and courts in dealing with an experienced older juvenile with an extensive prior record who knowingly and intelligently waives his Fifth Amendment rights and voluntarily consents to interrogation.

*Id.* at 725–26, 99 S.Ct. 2560.

After hearing the testimony and viewing the confession, the trial judge was not persuaded by Parker's argument that his father's presence represented an invocation of *Miranda* rights. Further, the father was not acting as a state agent during the interview when he asked Parker to tell him "what happened." *See, e.g., Adkins v. Com.,* 96 S.W.3d 779, 791 (Ky.2003) (after invoking *Miranda* rights, in-custody defendant told brother he had committed crime after brother encouraged him to take responsibility; brother then shared

information with officer and court found the confession was not caused by police conduct and officer "was not required to bar the jailhouse doors simply because he knew that a member of Appellant's family intended to induce him to confess.")

Parker cites an Illinois decision to demonstrate that a juvenile's statement was involuntary when a youth officer was not helpful and his parents were not allowed to see the boy during questioning. *In re J.J.C.*, 294 Ill.App.3d 227, 228 Ill.Dec. 751, 689 N.E.2d 1172 (1998). The case is not persuasive to Parker's appeal. While the lack of guidance from a friendly adult was considered, additional circumstances led the Illinois Court of Appeals to deem the confession inadmissible. In *J.J.C.*, the juvenile was "more susceptible than the general population of sixteen-year-olds" because of learning disabilities, psychiatric disorders, use and misuse of various psychotropic and antidepressant medications, and minimal prior police contact. *Id.* at 1180.

Finally, Parker contends he was "stressed out" and emotionally distraught from the entire ordeal when he was subjected to a three and one half hour interview. Specifically, he was in a car wreck, shot at by police, exposed overnight to the cold, and taken to the hospital. In ruling on the admissibility of Parker's statements, the trial judge had the opportunity in the *Denno* hearing to listen to the testimony, assess the demeanor and credibility of the witnesses, view the taped portion of the confession, and weigh the evidence accordingly. The evidence presented supports the trial court's conclusion the State met its burden of establishing, by a preponderance of the evidence, the statement was given freely and voluntarily. Luculently, the admission of Parker's statement was not an abuse of discretion.

## II. Motion to Reconsider

Parker avers the trial judge erred in denying his motion to reconsider the statement's admissibility and presents two bases for his argument. First, Parker claims testimony regarding the father's role in the confession was enhanced before the jury. Secondly, he posits Boykin's trial testimony concerning his framing of the shooting as an acci-

dent was more expansive than that offered in the *Denno* hearing.

Preliminarily, Parker did not argue to the trial judge that more information concerning the father was presented. Consequently, the argument is not preserved for our review. "Having failed to raise this issue at trial, appellant waived his right to argue it on appeal." *State v. Bailey,* 298 S.C. 1, 6, 377 S.E.2d 581, 584 (1989).

At trial, the following colloquy with Agent Boykin occurred on cross-examination:

Q: Isn't it true, Agent Boykin, that during the interrogation that while Rodney Parker was crying and sobbing and visibly upset; that you told him that you knew that he didn't mean to shoot Mr. Savage? And you knew it had to be an accident? Did you say that?

A: I did suggest that, yes, I did.

Q: So you actually, when you said how you believe it was an accidental shooting?

A: No, sir. I didn't believe it was accidental at all.

Q: So you actually were misleading, weren't you? When you said if you didn't believe it was an accidental shooting.

A: I was deceptive. That was not how I truly felt. But again, I was trying to interview him and get him to tell me the truth about what happened.

Q: The intent of telling him that was to try to elicit a confession out of him, wasn't it?

A: It was certainly my intent to [elicit] an admission from him as to what he had done. Yes, sir, that is true.

At the conclusion of the evidence, Parker asked the judge to reconsider the ruling on the admissibility of the confession:

Parker: I believe that additional information came out from this stand that didn't come out during the *Jackson v. Denno* concerning the confession. Whereby Agent Joe Boykin admitted that he intentionally deceived Rodney Parker by saying, you know, I know this was an accident. I know you didn't, you know, mean to shoot Mr. Savage.

Court: Do you want me in light of this, to reconsider my ruling on the admissibility of the statement?

Parker: Yes, sir. Because he admittedly used and he admitted for purposes.

Court: I paid attention to it. And that of course is something you are going to argue to the jury. But just like when I ruled on the *Denno* motion in the first place, I disagree with the spin, and I am not, I am not saying that in a critical way, but I disagree with the spin that you're putting on this. Mr. Boykin did admit that he—well he admitted what the record reflects he admitted. But I don't know that that changes my view as to whether or not the state has proven by the preponderance of the evidence that the statement was made by the defendant; that it was made after he had been given his Miranda warnings; that he had understood the rights that are included in the Miranda warnings, and that he waived those rights and that the statement was made voluntarily. I understand that's what you're going to argue. But it does not change, and I listened to it all. And I figured you are going to say this when we got to this point. But it does not change my mind about my answers to those four questions.

■■■ "On appeal, the trial court's ruling will not be disturbed absent a prejudicial abuse of discretion amounting to an error of law." *State v. Sheldon,* 344 S.C. 340, 342, 543 S.E.2d 585, 585–86 (Ct.App.2001). Here, the trial judge did not err in denying Parker's motion to reconsider. Boykin's trial testimony was consistent with that given in the *Denno* hearing. Parker alleges significance in Boykin's admission at trial that he suggested the shooting was "accidental" whereas, at the *Denno* hearing, he merely reported telling Parker he "knew he didn't mean to kill the victim." The transcripts reflect Boykin never represented that his sympathy was sincere nor offered for any other reason than to coax a confession. There was no abuse of discretion by the trial judge in denying the motion to reconsider where no new information altered his conclusion that the State had proven the statement was voluntary by a preponderance of the evidence.

### III. Change of Venue

■■■ Parker complains the trial court erred by denying his motion for a change of venue based on pre-trial publicity and the victim's standing in the small community. We disagree.

 The trial judge observed, "you only moved to strike one or two jurors for cause ... And the only way that I believe I could grant a motion for a change of venue is if I had taken out enough jurors for cause to where we didn't have [enough] jurors left to get a jury. That was clearly not a problem." We agree with Parker this is an incorrect standard for a change of venue, and acknowledge the State's contention that the motion was procedurally barred. This court, however, is "authorized to consider any sustaining ground found within the record." *Hutto v. State*, 376 S.C. 77, 654 S.E.2d 846 n. 2 (Ct.App.2007); *see also I'On, L.L.C. v. Town of Mount Pleasant*, 338 S.C. 406, 420, 526 S.E.2d 716, 723 (2000) ("The appellate court may review respondent's additional reasons and, if convinced it is proper and fair to do so, rely on them or any other reason appearing in the record to affirm the lower court's judgment."); Rule 220(c), SCRCP ("The appellate court may affirm any ruling, order, decision or judgment upon any ground(s) appearing in the Record on Appeal.").

> In essence, the right to a fair trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process. 'A fair trial in a fair tribunal is a basic requirement of due process.' In the ultimate analysis, only the jury can strip a man of his liberty or his life. [A] juror must he as 'indifferent as he stands unsworne.' His verdict must be based upon the evidence developed at the trial. This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies. 'The theory of the law is that a juror who has formed an opinion cannot be impartial.'

*Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (citations omitted); *Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965).

 Issues involved in a change of venue motion were recently addressed with certitude in *State v. Evins*, 373 S.C. 404, 645 S.E.2d 904 (2007), *cert. denied*, —— U.S. ——, 128 S.Ct. 662, 169 L.Ed.2d 521 (2007):

> A motion to change venue is addressed to the sound discretion of the trial judge and will not be disturbed on

appeal absent an abuse of discretion. *Sheppard v. State,* 357 S.C. 646, 594 S.E.2d 462 (2004); *State v. Manning,* 329 S.C. 1, 495 S.E.2d 191 (1997) (finding trial court abused discretion by granting the State's motion to change venue based on pretrial publicity because no evidentiary facts supported finding of actual juror prejudice towards the State). When a trial judge bases the denial of a motion for a change of venue because of pretrial publicity upon an adequate *voir dire* examination of the jurors, his decision will not be disturbed absent extraordinary circumstances. *State v. Caldwell,* 300 S.C. 494, 388 S.E.2d 816 (1990). When jurors have been exposed to pretrial publicity, a denial of a change of venue is not error where the jurors are found to have the ability to set aside any impressions or opinions and render a verdict based on the evidence presented at trial. *State v. Tucker,* 334 S.C. 1, 512 S.E.2d 99 (1999); *Manning,* 329 S.C. at 1, 495 S.E.2d at 191. Therefore, mere exposure to pretrial publicity does not automatically disqualify a prospective juror. *Id.* The relevant question is not whether the community remembered the case, but whether the jurors had such fixed opinions that they could not judge impartially the guilt of the defendant. *Id.* It is the defendant's burden to demonstrate actual juror prejudice as a result of such publicity. *Caldwell,* 300 S.C. at 494, 388 S.E.2d at 816.

*Evins,* 373 S.C. at 412–13, 645 S.E.2d at 908. *See State v. Longworth,* 313 S.C. 360, 438 S.E.2d 219 (1993) (a motion for change of venue is addressed to the sound discretion of the trial judge, and his ruling will not be disturbed absent abuse). "When the trial judge bases his ruling upon an adequate *voir dire* examination of the jurors, his conclusion that the objectivity of the jury panel has not been polluted by outside influence will not be disturbed absent extraordinary circumstances." *State v. Patterson,* 324 S.C. 5, 13, 482 S.E.2d 760, 764 (1997) (citing *State v. Copeland,* 278 S.C. 572, 300 S.E.2d 63 (1982)) (proper to deny venue change when judge questioned every juror about knowledge of case, disqualified six who reported inability to be partial, and verified remaining jurors said they could be objective); *State v. Manning,* 329 S.C. 1, 495 S.E.2d 191 (1997) (finding trial court abused discretion by granting State's motion to change venue due to pretrial publicity when

no evidence supported finding of actual juror prejudice against State); *State v. South*, 285 S.C. 529, 331 S.E.2d 775 (1985) (no abuse of discretion in refusing change of venue in murder trial due to publicity where trial judge carefully screened prospective jurors to ensure fair trial).

In support of his motion, Parker submitted an affidavit stating seven issues of the local, bi-weekly paper featured him in articles and capture photos. He averred the articles discussed his guilty plea, all pending charges, his prior criminal history and troubles "to such a degree and extent that it would not be possible to pull an untainted jury panel pool in Colleton County. . . ." Parker cited *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), and *Patton v. Yount*, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984), for the proposition that pretrial publicity may be sufficiently severe to cause the presumption of prejudice in the community thus rendering a fair trial impossible.

> However, in *Dowd* the Court stated there was no requirement that jurors be totally ignorant of the facts and issues involved in the case. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Dowd*, 366 U.S. at 723, 81 S.Ct. at 1643, 6 L.Ed.2d at 756. The Court in *Dowd* ultimately concluded that the pretrial publicity was unduly prejudicial to the defendant because eight of the twelve jurors finally placed in the jury box expressed, during voir dire, their belief that the defendant was in fact guilty.

*State v. Kelsey*, 331 S.C. 50, 68, 502 S.E.2d 63, 72 (1998) (finding no error by denying change of venue when nine of twelve seated jurors had heard some coverage of case but told judge they could set aside what they had heard and decide case on evidence presented); *see also State v. Caldwell*, 300 S.C. 494, 388 S.E.2d 816 (1990) (no abuse of discretion to deny venue change when eleven seated jurors and two alternates acknowledged exposure to media coverage but said they could be impartial and decide case on evidence presented); *State v. Avery*, 374 S.C. 524, 649 S.E.2d 102 (Ct.App.2007) (no abuse of discretion to deny change of venue when vast majority of venirepersons read of crime in local paper at time it was committed and remembered only the fact that it occurred, and when two of six venirepersons who could not set aside opinion

of guilt were excused); *State v. Easler,* 322 S.C. 333, 471 S.E.2d 745 (Ct.App.1996) (pretrial publicity did not entitle defendant to change of venue when he submitted several recent local newspaper articles recounting the accident and its effects on victim's family). In *Patton,* the Supreme Court held the trial court did not err in finding the jury as a whole was impartial at the defendant's second trial though his first trial four years earlier was held when "the extensive adverse publicity and the community's sense of outrage were at their height...." *Id.* at 1032, 104 S.Ct. 2885.

 The presumption of prejudice from pretrial publicity is "rarely applicable." *Harris v. Pulley,* 885 F.2d 1354, 1361 (9th Cir.1988); *accord Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 554, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). It is "confined to those instances where the petitioner can demonstrate an 'extreme situation' of inflammatory pretrial publicity that literally saturated the community in which his trial was held." *Mayola v. Alabama,* 623 F.2d 992 (5th Cir.1980) (citing *Hale v. United States,* 435 F.2d 737, 747 (5th Cir.1970)); *see, e.g., Rideau v. State of Louisiana,* 373 U.S. 723, 726, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (prejudice presumed and conviction reversed after confession filmed with police cooperation and broadcast on television for three days while defendant awaited trial, saying "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality.")

Here, the trial judge thoroughly examined the venirepersons regarding pretrial publicity. He first explained to them:

Now one of the things that I want to ask you now, I want you to continue to think about this as we go through the rest of these questions. You've heard about the allegations of the indictment. You know the timing of the alleged crimes. I will tell you that there has been some publicity in the press about this case. And they're probably going to be some of you who have heard about this case or read about this case. If there is any member of the jury panel who at this time can remember ever having learned or heard or read or seen anything about this case or if you in any way know anything about this case, please stand. Now I am going to ask those of you who are standing to come over here to this side of the courtroom at this swinging door and

form a line. And I will speak to you one at a time. Now the rest of you, if at any point during the rest of these questions, you think of any, if you think of the fact, if you remember having heard anything or if you can remember that you know anything about this case, then I would kike for you to bring that to my attention at that time. I will tell you what I am going to do, I want to say this to everybody before I start speaking to you individually. As member of the jury, it is your responsibility to come into this courtroom and to set aside anything that you may have heard or anything you may have learned about this case. Set aside any biases or prejudices that you may have, and to listen very carefully to the testimony and the evidence that will be presented here in this courtroom. And then when it becomes time to render a verdict that is based solely on the testimony and the evidence that you hear and you see in this courtroom in light of the law as I would instruct you, and that would be your responsibility as jurors. Now we recognize that sometimes there are people who have relationships. They have prior experiences. They have biases or they have prejudices or whatever, that make it difficult. That make it difficult for you to comply with your responsibility as jurors. And that's basically what we want to talk about right now.

I want to know what you heard. What you learned. What you saw. And whether or not you feel that you will be able to set that aside, and listen to the testimony and evidence that will be presented here in from of you in this courtroom and render a verdict based solely on that evidence.

Ten veniremen admitted they had been exposed to pretrial publicity. Each were questioned individually to determine (1) what prior exposure they had to the facts of the case, (2) what details they recalled, (3) whether or not they had discussed the matter with anyone, and (4) whether their knowledge of any individuals involved in the case would interfere with their willingness or ability to give both the State and Parker a fair and impartial trial. Five veniremen knew of the victim. In one instance, Parker moved to strike a juror who knew the victim's brother because she shopped at his feed store. The strike was denied because the trial judge was satisfied with

the juror's response that she could provide a fair, impartial trial.

There was no indication any of the seated jurors had formed pretrial opinions of Parker's guilt. " '[A defendant's] mere assertion that the jurors could have been subconsciously affected by ... media exposure is insufficient to show prejudice.' " *State v. Kelsey*, 331 S.C. 50, 502 S.E.2d 63, 68 (1998) (quoting *State v. Owens*, 293 S.C. at 167, 359 S.E.2d at 278). Parker has not gone beyond this mere assertion to show actual prejudice and there is no indication the trial judge's *voir dire* was inadequate or failed to produce an impartial jury. Finding no abuse of discretion, we affirm the trial judge's denial of the motion for change of venue.

## CONCLUSION

We hold the trial court did not abuse its discretion in admitting Parker's statement, nor were the motions for reconsideration and change of venue improperly denied. Accordingly, the judgments of the trial court are

**AFFIRMED.**

HUFF and THOMAS, JJ., concur.