# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Edward Primo Bonilla, Appellant.

Appellate Case No. 2016-001725

_____

Appeal From Dorchester County
Doyet A. Early, III, Circuit Court Judge

_____

Opinion No. 5702
Heard December 9, 2019 – Filed December 31, 2019

_____

**AFFIRMED**

_____

Chief Appellate Defender Robert Michael Dudek, of
Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Deputy Attorney
General Donald J. Zelenka, Senior Assistant Deputy
Attorney General Melody Jane Brown, and Assistant
Attorney General Susannah Rawl Cole, all of Columbia;
and Solicitor David Michael Pascoe, Jr., of Orangeburg,
all for Respondent.

_____

**GEATHERS, J.:** Edward Primo Bonilla was convicted of murder for the killing of
Ashley Pegram and sentenced to life imprisonment. Bonilla appeals his conviction,
arguing the circuit court erred in 1) finding Bonilla gave his attorney informed
consent to disclose the location of Ashley's body; 2) admitting evidence obtained
from the search of Bonilla's mother's Hyundai Sonata; 3) admitting evidence

obtained from the search of a van owned by Bonilla's employer; and 4) refusing to grant Bonilla an in camera hearing on the qualifications of Investigator Jeff Scott and the reliability of his testimony. We affirm.

**FACTS**

The investigation into Ashley's disappearance

Around March 15, 2015, Bonilla and Ashley Pegram[1] met on the online social site Meetme.com, and the two communicated for about a month using the messaging app "Kik." On April 3, 2015, Bonilla and Ashley arranged to meet in person and attend a bonfire hosted by Bonilla's brother. During their communications, Ashley indicated that she did not have a car, and Bonilla offered to pick her up from the house she shared with her parents in Summerville. Ashley then asked if he would pick up some beer for her, and Bonilla agreed. After Bonilla left his house, Ashley texted him her address, and he entered it into his phone's GPS. Shortly before 9:30 p.m., Bonilla arrived in a Hyundai Sonata, and the two left for the bonfire.

Ashley and Bonilla arrived at his brother's house for the bonfire around 9:30 p.m. While at the bonfire, Ashley had a few drinks before she and Bonilla left around 11:45 p.m. After leaving the bonfire, Ashley indicated she needed to use the restroom, and Bonilla stopped at a Sunoco gas station around 12:04 a.m. on April 4, 2015. At 12:11 a.m., the gas station's surveillance system captured Ashley reentering the vehicle, and the two left a minute later.

Later that morning, Ashley's mother reached out to Ashley's sister because Ashley had not returned from her date the previous night. Once Ashley's sister arrived at the house, the family looked through the phone Ashley shared with her mother for any clues as to her disappearance. In doing so, they found Kik messages between Ashley and a man with the username "E-Money Bon" discussing plans to go to a bonfire the night before. Additionally, they found a message from "E-Money Bon" at 3:29 a.m. that morning, reading "Hello. You still awake? Just making sure you made it home. Sorry I left at the gas station but you were too drunk to handle." Thereafter, the family called "E-Money Bon" from three different phones and messaged him on Kik, but he did not answer or respond. At some point, the family made contact with "E-Money Bon" on Ashley's daughter's phone. "E-Money Bon" identified himself as Edward Bonilla and indicated that he had left Ashley in front of a mobile home park, but he did not know what happened to her afterward.

---

[1] Ashley was a twenty-eight-year-old mother of three.

After communicating with Bonilla, Ashley's family filed a missing persons report with the Dorchester County Sheriff's Office, and provided officers with Bonilla's phone number and screenshots of the messages between Ashley and Bonilla. As part of his investigation, Detective David Harris called Bonilla and advised him that he was looking for a missing person. Bonilla described his night out with Ashley before telling Detective Harris that he left Ashley on the side of the road around 2:00 a.m. after he let her out to use the restroom a second time.

On April 7, 2015, Ashley's missing persons case was assigned to Detective Andy Martin, who made contact with Bonilla and scheduled an interview for the next day.[2] On April 8, Bonilla arrived for the interview in his mother's Hyundai Sonata with his mother and girlfriend.[3] After Bonilla's mother and girlfriend left to run errands, Bonilla was taken to an interview room. During the interview, Bonilla summarized the events of the night, indicating the last time he saw Ashley was when he left her in front of a mobile home park after pulling over to let her use the restroom. Bonilla further indicated that he was unemployed due to an ankle injury. After the interview, Bonilla showed Detective Martin a shoeprint on the front quarter panel of his mother's Hyundai Sonata and told Detective Martin that Ashley had kicked the vehicle after exiting to use the restroom. Officers and volunteers later combed the area where Bonilla claimed he left Ashley, but they could not locate her.

On April 15, 2015, Detective Martin was contacted by Bonilla's brother's girlfriend, who attended the bonfire on April 3. During their conversation, she revealed that Bonilla was employed at Cauble Flooring in Charleston County. Detective Martin then contacted Robert Cauble, the owner of Cauble Flooring, and confirmed that Bonilla was one of his employees. Cauble also indicated that Bonilla had access to two work vans; a Chevy GMC that he typically worked out of with his brother and a Ford Econoline that the company used as a "floater" van. Detective Martin indicated that he needed to look at the vans in connection with a missing persons case, and the two agreed to meet at Cauble Flooring. Coincidentally, Bonilla called Cauble moments after he got off the phone with Detective Martin and told Cauble that he needed to retrieve his cell phone from one of the vans.

Cauble was the first to arrive at Cauble Flooring and, acting on Detective Martin's inquiry, he pulled up the security footage from April 3 and 4, 2015. The

_____

[2] Detective Martin also requested the surveillance video from the Sunoco, obtained Bonilla's phone records, and contacted the South Carolina Law Enforcement Division ("SLED") for license plate reader information on the Hyundai Sonata.

[3] Bonilla was dating a woman named Jasmine in April 2015.

footage from April 3 showed Bonilla and his brother arriving at the end of the work day in the Chevy GMC. However, while Bonilla's brother left in the Chevy GMC, Bonilla left in the Ford Econoline. On the footage from April 4, an unidentified person could be seen returning the Ford Econoline at 10:55 p.m., parking it in the same spot it had been taken from the day before. Additionally, a small car could be seen pulling in behind to pick up the person. Cauble also indicated that Bonilla texted him on April 4 at 4:50 a.m., indicating that he was sick and would not be in to work, and again on April 6, indicating the same.

Once everyone arrived at Cauble Flooring, Detective Martin confronted Bonilla for lying about his employment. Bonilla, in the presence of Cauble, claimed that he had started working at Cauble Flooring on April 14, 2015. However, Cauble indicated that Bonilla had been employed for eight months. Bonilla was charged with obstruction of justice the same day.

After Cauble signed a "consent to search and/or seizure" form, officers searched both vans. While searching the Chevy GMC, officers found Bonilla's cell phone. Upon searching the Ford Econoline, officers discovered multiple red hued stains. Investigator Jeff Scott field-tested four stains, one of which tested "presumptive positive" for blood, and officers arranged to have the van towed to Dorchester County. On the same day, officers located Bonilla's mother's Hyundai Sonata at an Enterprise Rent-A-Car in Charleston County. Records indicated that Bonilla's mother had rented a silver Chevy Cruze on April 4, 2015, at 11:01 a.m.[4] The Hyundai Sonata was then seized, in cooperation with the North Charleston Police Department, and towed back to Dorchester County. After seizing the Hyundai Sonata and the Ford Econoline, officers obtained search warrants for both from a Dorchester County magistrate.

On May 5, 2015, Bonilla was charged with murder. On May 8, 2015, he was transported to the Dorchester County Sheriff's Office where he met with his attorney, Mark Leiendecker, in a small conference room. During the meeting, Bonilla provided the location of Ashley's body to Leiendecker and consented to its disclosure.[5] On May 9, 2015, after searching the location for two days, police found Ashley's body in a shallow grave in Harleyville.

---

[4] The Chevy Cruze was consistent with the vehicle that could be seen on surveillance footage picking up the individual from Cauble Flooring on the night of April 4, 2015.
[5] Leiendecker was assigned to represent Bonilla after he was charged with obstruction of justice on April 15, 2015. Leiendecker maintained that he and Bonilla had previously discussed the decision to disclose prior to the date of disclosure.

<u>The trial</u>

Bonilla's case proceeded to trial on August 8, 2016. Prior to trial, Bonilla made several pre-trial motions. First, Bonilla moved to have his statement regarding the location of Ashley's body suppressed, arguing Leiendecker violated Rule 1.6 of the South Carolina Rules of Professional Conduct by disclosing the location without Bonilla's informed consent. The circuit court allowed testimony on the issue from Leiendecker and Bonilla. While testifying, Leiendecker took care not to reveal any more confidential discussions between he and Bonilla than necessary to determine the issue of informed consent. Leiendecker testified that he did not know the location of Ashley's body until Bonilla revealed it to him on May 8, 2015, but he asserted that he and Bonilla had discussed the decision to disclose the location in meetings and telephone calls prior to the date of disclosure. Leiendecker explained that disclosing the location of Ashley's body was a key part of Bonilla's defense of accident, as there would be no evidence to corroborate the defense without an autopsy to determine Ashley's cause of death. In discussing potential consequences, Leiendecker told Bonilla that if he disclosed the location of the body, Bonilla would not be able to deny that he knew what happened to Ashley, it would place him at the scene of an alleged murder, and it would open him up to other charges. When the two met on the date of disclosure, they further discussed the issue before Bonilla drew a map to Ashley's body on Leiendecker's iPad. According to Leiendecker, after further discussion, Bonilla consented to the disclosure of the information. Thereafter, Leiendecker shared the information with the Dorchester County Sheriff's Office. Bonilla did not speak to any officers during the process.

Bonilla testified that he and Leiendecker never discussed disclosing the body's location prior to May 8, 2015. Rather, Bonilla indicated that Leiendecker called him on May 8 to let him know that officers were transporting him to the Dorchester County Sheriff's Office to disclose the location of the body. Bonilla testified that once he arrived at the sheriff's office, Leiendecker explained the benefits of disclosing the location but not the possible ramifications. Bonilla indicated that he felt like things were already in motion to the point that he was backed into a corner. However, Bonilla testified that he was ultimately "on board" with the decision to disclose, confirming that Leiendecker would have believed he had Bonilla's consent to disclose.

---

After determining he would be called to testify about the disclosure, Leiendecker was conflicted out of the case. Bonilla was subsequently provided with alternate counsel.

After hearing testimony from Leiendecker and Bonilla, the circuit court ruled on the issue. Using *McClure v. Thompson*[6] as a guide, the circuit court found that 1) Bonilla had given his consent to disclose the location of Ashley's body and 2) Leiendecker provided full legal guidance and a cautionary explanation of the benefits and consequences of disclosure. Thus, the circuit court found that Bonilla had given Leiendecker informed consent to disclose the location of the body. The circuit court further found Leiendecker to be more credible than Bonilla. Based on the circuit court's findings, Bonilla and the State agreed to stipulate to the fact that Bonilla had disclosed the body's location in lieu of calling Leiendecker to testify during trial.

Next, Bonilla moved to suppress evidence obtained from the Hyundai Sonata and the Ford Econoline. Bonilla argued the warrants were defective because they were both obtained from a Dorchester County magistrate even though the vehicles were seized from Charleston County. Bonilla further argued the warrant for the Hyundai Sonata was defective because the affidavit setting forth the basis for probable cause indicated that Ashley was seen entering the vehicle at the Sunoco around 1:12 a.m. rather than 12:12 a.m. As to the search warrants, the State argued that both were obtained after the vehicles were seized and brought to Dorchester County, placing both within the jurisdiction of the Dorchester County magistrate. Furthermore, the State asserted that the warrant for the Hyundai Sonata was proper because the underlying affidavit still supported a finding of probable cause to search the vehicle after the inaccurate information was removed. The State then argued the Hyundai Sonata was properly seized pursuant to the automobile exception to the warrant requirement, further asserting the vehicle could have been searched without a warrant under the same exception. Finally, the State argued Cauble had given his consent for the search and seizure of the Ford Econoline, adding that it was properly seized after a stain in the back tested "presumptive positive" for blood. The circuit court ultimately determined the evidence to be admissible, finding both search warrants were proper and both vehicles were properly seized and searched under the automobile exception.

During the trial, the State presented multiple witnesses detailing the investigation into Ashley's disappearance. Bonilla's brother's girlfriend testified that Ashley was not overly intoxicated at the bonfire, but Bonilla was adamant that she continue drinking from a particular bottle of beer when they left. The State also elicited testimony detailing Bonilla's inconsistent statements regarding Ashley's disappearance and his efforts to impede the investigation. Additionally, the State

---

[6] 323 F.3d 1233 (9th Cir. 2003).

presented phone records and footage from surveillance cameras demonstrating Bonilla's travels on the night Ashley disappeared.

Before Investigator Scott's testimony, Bonilla objected to the admission of photographs depicting the results of several tests used to determine the presence of blood in the seized vehicles. Bonilla asserted that, because Investigator Scott would be giving his opinion that stains in both vehicles tested positive for Ashley's blood, he was entitled to an evidentiary hearing regarding the reliability of the tests. The circuit court noted that Investigator Scott was not qualified to give an opinion on whether the stains tested positive for Ashley's blood. The circuit court then asked Bonilla if he was objecting specifically to the admission of the photographs, to which he responded, "Yes, sir." Consequently, the circuit court indicated Bonilla would be required to object contemporaneously when the photographs were admitted.

During Investigator Scott's testimony, Bonilla objected to the admission of photographs depicting O-Tolidine, hexagon OBTI, and leucocrystal violet tests. The circuit court overruled each objection. However, Bonilla did not object when Investigator Scott described how each test was conducted, when he explained that a "presumptive positive" for blood would turn a certain color depending on the particular test, or when he indicated that stains in the van and the trunk of the Hyundai Sonata tested presumptive positive under each test. After Investigator Scott testified, SLED Agent Paul Meeh testified that the blood obtained from both vehicles matched Ashley's DNA.

Investigator Scott further testified that officers found a tube of Astroglide personal lubricant in the Ford Econoline.[7] Investigator Scott also recounted finding Ashley's body, indicating she was found nude from the waist down. Additionally, Investigator Scott indicated that there appeared to be something wrapped around Ashley's wrist and neck. Following Investigator Scott's testimony, the State presented an expert in bloodstain pattern analysis. The expert testified that multiple cast-off patterns were found on the ceiling of the van and a cessation cast-off pattern was found on the rear wheel well. He provided that these patterns were consistent with someone standing over a victim and taking multiple swings at the victim.

The State then presented Dr. Nicholas Batalis as an expert in forensic pathology. Dr. Batalis explained that he could not determine the specific cause of death because Ashley had been dead for an extended period of time and the body had undergone significant decomposition. Dr. Batalis testified that Ashley's body

---

[7] Cauble testified that Cauble Flooring did not use Astroglide in its day-to-day activities.

was nude from the waist down, her torn shirt and bra were around her upper chest area, and her glasses were tangled in her hair. Furthermore, Dr. Batalis indicated Ashley's neck and right wrist had been wrapped in black electrical tape, stating that the tape around the wrist was fashioned into two loops and appeared to resemble handcuffs.[8] Dr. Batalis testified that the tissue and internal organs were missing from Ashley's buttocks and vaginal area, suggesting that the area could have been a location of injury.[9] Regarding Ashley's cause of death, Dr. Batalis testified that Ashley had fractures on both sides of her thyroid cartilage, suggesting manual strangulation. Additionally, Dr. Batalis indicated that there was a circular defect on Ashley's scalp and areas of bluish-purple discoloration on her skull, suggesting blunt force trauma. Dr. Batalis also indicated that fluid from Ashley's chest cavity tested positive for low concentrations of alcohol and a muscle relaxer.[10] Dr. Batalis ultimately determined that the "cause of death in this case was homicidal violence."

After the State rested, Bonilla elected to testify in his own defense. Bonilla described the events leading up to and following the bonfire, indicating that he and Ashley returned to his house to drop off some marijuana after they left. Bonilla then explained that he tried to take Ashley home, but she was combative and could not adequately provide directions.[11] Bonilla indicated that Ashley asked to stop and use the restroom twice, once at the Sunoco and once on the side of a private driveway. Bonilla asserted that the second time they stopped, he attempted to leave Ashley because she was being combative but while backing up, he accidentally hit Ashley with the back of his car. Bonilla claimed that when he got out to check on her, Ashley began attacking him. He alleged that he then wrapped Ashley in a "bear hug" in an attempt to restrain her and she died in his arms. Bonilla asserted that he did not know how Ashley died and he did not mean to harm her.

Bonilla testified he placed Ashley's body in the trunk of his mother's Hyundai Sonata. He then drove a while before leaving the body on the side of a dirt road. After going home, Bonilla indicated he returned to retrieve Ashley's body in the Ford Econoline. Bonilla claimed that he put a plastic bag over Ashley's head and taped it

---

[8] While Ashley's left wrist was not bound by the open loop of the "tape handcuffs," Dr. Batalis noted that it had decomposed down to the bone.

[9] Due to the lack of tissue, Dr. Batalis could not perform a sexual assault protocol on the body.

[10] Bonilla testified that his girlfriend was suffering from back and shoulder pain around the time Ashley was killed.

[11] The State presented Bonilla's phone records to demonstrate that Bonilla had previously searched Ashley's address in his phone's GPS app.

to her neck so that she would not bleed in the van. After placing Ashley's body in the van, Bonilla drove until he found a deserted road in a wooded area. Bonilla then removed Ashley's body from the van, hid the van, and dug a grave with a wooden board. Bonilla claimed that while he was dragging Ashley's body through the woods, her pants and underwear got snagged and fell off. After placing Ashley's body in the grave and covering it with dirt, Bonilla returned to the location where Ashley died. He picked up one of Ashley's sandals, discarding it and the bag he used to cover her head in a gas station dumpster.

After deliberations, the jury convicted Bonilla for murder. The circuit court then sentenced him to a term of life imprisonment. This appeal followed.

## ISSUES ON APPEAL

1. Did the circuit court err in finding Bonilla gave his attorney informed consent to disclose the location of Ashley's body?

2. Did the circuit court err in admitting evidence obtained from the search of Bonilla's mother's Hyundai Sonata?

3. Did the circuit court err in admitting evidence obtained from the search of a van owned by Bonilla's employer?

4. Did the circuit court err in refusing to grant Bonilla an in camera hearing on the qualifications of Investigator Scott and the reliability of his testimony?

## STANDARD OF REVIEW

"In criminal cases, the appellate court sits to review errors of law only." *State v. Wilson*, 345 S.C. 1, 5, 545 S.E.2d 827, 829 (2001). Therefore, "[an appellate court is] bound by the [circuit] court's factual findings unless they are clearly erroneous." *Id*. at 6, 545 S.E.2d at 829.

Determination of informed consent

"In criminal cases, appellate courts are bound by fact finding in response to preliminary motions where there has been conflicting testimony or where the findings are supported by the evidence and not clearly wrong or controlled by an error of law." *State v. Parker*, 381 S.C. 68, 74, 671 S.E.2d 619, 622 (Ct. App. 2008) (quoting *State v. Asbury*, 328 S.C. 187, 193, 493 S.E.2d 349, 352 (1997)).

Admission of evidence

"The admission of evidence is within the discretion of the [circuit] court and will not be reversed absent an abuse of discretion. An abuse of discretion occurs when the conclusions of the [circuit] court either lack evidentiary support or are controlled by an error of law." *State v. Goodwin*, 384 S.C. 588, 601, 683 S.E.2d 500, 507 (Ct. App. 2009) (quoting *State v. Pagan*, 369 S.C. 201, 208, 631 S.E.2d 262, 265 (2006)). Therefore, "[a circuit court] has considerable latitude in ruling on the admissibility of evidence[,] and [its] rulings will not be disturbed absent a showing of probable prejudice." *State v. Kelley*, 319 S.C. 173, 177, 460 S.E.2d 368, 370 (1995).

Fourth Amendment

"When reviewing a Fourth Amendment search and seizure case, an appellate court must affirm the [circuit court]'s ruling if there is any evidence to support the ruling." *State v. Weaver*, 374 S.C. 313, 319, 649 S.E.2d 479, 482 (2007). "The appellate court will reverse only when there is clear error." *Id*.

## LAW/ANALYSIS

### I. Confidentiality and informed consent

Bonilla argues the circuit court erred in finding that he provided his initial attorney, Leiendecker, with informed consent to disclose the location of Ashley's body. The State argues the circuit court properly determined that Bonilla gave informed consent. We agree with the State.

Pursuant to Rule 1.6(a) of the South Carolina Rules of Professional Conduct, "[a] lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation or the disclosure is permitted by paragraph (b)[12]." Rule 1.6(a), RPC, Rule 407, SCACR. "'Informed consent' denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated reasonably adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." Rule 1.0(g), RPC, Rule 407, SCACR.

---

[12] Rule 1.6(b) provides eight exceptions under which an attorney may reveal information protected by Rule 1.6(a). Rule 1.6(b), RPC, Rule 407, SCACR. None of these exceptions are applicable to the case at bar.

At the outset, we find that a direct appeal is not the proper mechanism by which to adjudicate this issue for two reasons. First, even if Bonilla could demonstrate that he did not give informed consent, we do not believe this court could provide appropriate relief. At trial, Bonilla moved to suppress his statement to Leiendecker disclosing the location of Ashley's body. However, we note the exclusionary rule is meant to deter improper police conduct. *See State v. Brown*, 401 S.C. 82, 92, 736 S.E.2d 263, 268 (2012) ("[T]he exclusionary rule's *sole purpose* is to deter future [constitutional] violations [by law enforcement] and []where suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly . . . unwarranted.'" (emphasis added) (quoting *Davis v. United States*, 564 U.S. 229, 237 (2011)). Here there was no improper police conduct to deter by suppressing Bonilla's statement, as Bonilla alleged that his attorney, not law enforcement, acted inappropriately. Additionally, even if the statement could be suppressed, we do not find that this would preclude the admission of evidence gathered when Ashley's body was discovered. *Cf. United States v. Patane*, 542 U.S. 630, 633–34 (2004) (holding that, in the context of a *Miranda* violation, the exclusionary rule only applies to testimonial and not physical evidence); *see also Nickel v. Hannigan*, 97 F.3d 403, 409 (10th Cir. 1996) ("[C]ourts have refused to apply such a broad evidentiary rule of exclusion to breaches of privilege."); *United States v. Marashi*, 913 F.2d 724, 731 n.11 (9th Cir. 1990) (stating in dictum "that no court has ever applied [the 'fruits of the poisonous tree'] theory to *any* evidentiary privilege"). As such, because Bonilla is challenging the actions of his attorney, his claim regarding Rule 1.6 would best be addressed in an action for ineffective assistance of counsel,[13] which this court is precluded from hearing on direct appeal. *See Matter of Chapman*, 419 S.C. 172, 182, 796 S.E.2d 843, 847 (2017) ("Thus, on direct appeal, [appellate courts] will not consider claims involving ineffective assistance of counsel.").

Second, this court's scope of review is limited by the evidence in the record on appeal. *See* Rule 210(h), SCACR ("Except as provided by Rule 212 and Rule 208(b)(1)(C) and (2), the appellate court will not consider any fact [that] does not appear in the Record on Appeal."); *see also Sanders v. Salley*, 283 S.C. 458, 460, 322 S.E.2d 829, 830 (Ct. App. 1984) ("This [c]ourt does not sit as a trial court to receive evidence on disputed issues of fact; our function is to review the judgment of the circuit court for reversible error based on the issues and evidence presented to

---

[13] *See* Robert P. Mosteller, *Admissibility of Fruits of Breached Evidentiary Privileges: The Importance of Adversarial Fairness, Party Culpability, and Fear of Immunity*, 81 Wash. U. L.Q. 961, 990–92 (2003) (identifying ineffective assistance of counsel as the proper action by which to challenge an attorney's disclosure of confidential or privileged information to law enforcement).

that court."). Thus, this court's review is limited to the testimony provided by Bonilla and his attorney, who took care not to reveal the substance of his confidential discussions with Bonilla. Without more information regarding what Bonilla and his attorney actually discussed, this court cannot find that the circuit court's determination regarding informed consent was "clearly wrong." *See Parker*, 381 S.C. at 74, 671 S.E.2d at 622 ("In criminal cases, appellate courts are bound by fact finding in response to preliminary motions . . . where the findings are supported by the evidence and not clearly wrong or controlled by an error of law." (quoting *Asbury*, 328 S.C. at 193, 493 S.E.2d at 352)).

If Bonilla believes he did not give Leiendecker informed consent to disclose the location of Ashley's body, post-conviction relief ("PCR") would be the proper mechanism by which to adjudicate this issue for several reasons. First, in PCR, Bonilla could challenge the finding that he gave informed consent and seek appropriate relief by bringing a claim for ineffective assistance of counsel. *See Matter of Chapman*, 419 S.C. at 181, 796 S.E.2d at 847 ("[T]he legislature provided an alternative procedure by which criminal defendants must assert claims regarding ineffective assistance of counsel: post-conviction relief (PCR)."). Second, the PCR court could receive additional evidence regarding the issue of informed consent. *See* S.C. Code Ann. § 17-27-80 (2014) ("The [PCR] court may receive proof by affidavits, depositions, oral testimony or other evidence and may order the applicant brought before it for hearing.") Finally, the PCR court would not be constrained by Rule 1.6 or attorney-client privilege. *See Drayton v. Indus. Life & Health Ins. Co.*, 205 S.C. 98, 108, 31 S.E.2d 148, 152 (1944) ("The general rule excludes from evidence confidential communications of a professional nature between attorney and client, unless the client, for whose benefit the rule is established[,] waives the privilege."); *see also* S.C. Code Ann. § 17-27-130 (2014) ("Where a defendant alleges ineffective assistance of prior trial counsel . . . as a ground for post-conviction relief . . . , the applicant shall be deemed to have waived the attorney-client privilege with respect to both oral and written communications between counsel and the defendant . . . to the extent necessary for prior counsel to respond to the allegation.").

Although we do not believe a direct appeal is the proper mechanism by which to challenge Leiendecker's disclosure, we will review the circuit court's finding of fact under our narrow scope of review.

Given the uncommon nature of this scenario, our jurisprudence on the issue is limited. Consequently, the circuit court applied the standard from *McClure v.*

*Thompson*,[14] a Ninth Circuit habeas corpus case. In *McClure*, the Ninth Circuit found an attorney's failure to obtain informed consent before disclosing evidence would entitle a defendant to bring a claim for ineffective assistance of counsel. 323 F.3d at 1242–43. The court observed that "[t]he professional standard that allows disclosure of confidential communications when 'the client consents after consultation' has two distinct parts: consent by the client, and consultation by the counsel." *Id*. at 1243. Accordingly, the court provided that "the mere fact of consent is not sufficient to excuse what would otherwise be a breach of the duty of confidentiality. Consent must also be informed. That is, the client can provide valid consent only if there has been appropriate 'consultation' with his or her attorney." *Id*. at 1244. "Even in cases in which the negative ramifications seem obvious[,] . . . we require that a criminal defendant's decision be made on the basis of legal guidance and with full cautionary explanation." *Id*. Due to the similarities between the standard espoused by the Ninth Circuit and our state's definition of informed consent set forth in Rule 1.0(g), we believe the circuit court properly relied on *McClure* as persuasive guidance in determining whether Bonilla provided informed consent.

Here, Bonilla conceded that he consented to Leiendecker's disclosure. Thus, applying the standard from *McClure*, the circuit court next determined whether Bonilla's consent was given after full consultation with his attorney. *See id*. ("[T]he mere fact of consent is not sufficient . . . ."). Leiendecker indicated that he had multiple conversations with Bonilla about disclosing the location of Ashley's body, described the benefits of disclosure, and explained the potential consequences of disclosure. Leiendecker further testified that, for the purpose of establishing Bonilla's accident defense, he did not believe there was any reasonable alternative to disclosure. Given Leiendecker's testimony, we conclude there is evidence in the record to support the circuit court's finding of informed consent. *See Parker*, 381 S.C. at 74, 671 S.E.2d at 622 ("In criminal cases, appellate courts are bound by fact finding in response to preliminary motions . . . where the findings are supported by the evidence and not clearly wrong or controlled by an error of law." (quoting *Asbury*, 328 S.C. at 193, 493 S.E.2d at 352)); *see also* Rule 1.0(g), RPC, Rule 407, SCACR ("'Informed consent' denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated reasonably adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct."); *McClure*, 323 F.3d at 1244 ("[T]he client can provide valid consent only if there has been appropriate 'consultation' with his or her attorney."). While Bonilla testified that Leiendecker did not explain the

---

[14] 323 F.3d at 1233.

ramifications of disclosure, the circuit court found Bonilla's testimony to be less credible than Leiendecker's. *See Wilson*, 345 S.C. at 6, 545 S.E.2d at 829 ("[An appellate court is] bound by the [circuit] court's factual findings unless they are clearly erroneous."). Thus, given this court's limited scope of review, the circuit court's finding is not overcome by Bonilla's conflicting testimony. *See Parker*, 381 S.C. at 74, 671 S.E.2d at 622 ("In criminal cases, appellate courts are bound by fact finding in response to preliminary motions where there has been conflicting testimony . . . ." (quoting *Asbury*, 328 S.C. at 193, 493 S.E.2d at 352)). Accordingly, the circuit court did not err in finding Bonilla gave Leiendecker his informed consent to disclose the location of Ashley's body.

## II. Fourth Amendment challenges

### a. Exceptions to the warrant requirement

Bonilla argues the circuit court erred in admitting the evidence obtained from the vehicles because both search warrants were defective. The State argues warrants were not required because Cauble gave his consent to search and seize the Ford Econoline, and the automobile exception to the warrant requirement applied to both vehicles. We agree with the State.

The Fourth Amendment to the United States Constitution provides,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV. "Evidence seized in violation of the Fourth Amendment must be excluded from trial." *Weaver*, 374 S.C. at 319, 649 S.E.2d at 482. "As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is 'reasonableness.'" *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995). "Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant[.]" *Id*. at 653. Therefore, warrantless searches are generally *per se* unreasonable and violate the Fourth Amendment's prohibition against unreasonable searches and seizures. *Weaver*, 374 S.C. at 319, 649 S.E.2d at 482. "However, a warrantless search will withstand constitutional scrutiny where

the search falls within one of several well-recognized exceptions to the warrant requirement." *Id*.

One such exception to the warrant requirement is the automobile exception. *Id*. "Pursuant to the automobile exception, if there is probable cause to search a vehicle, a warrant is not necessary so long as the search is based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained." *Id*. at 320, 649 S.E.2d at 482. "The automobile exception to the search warrant requirement is based on: (1) the ready mobility of automobiles and the potential that evidence may be lost or destroyed before a warrant is obtained and (2) the lessened expectation of privacy in motor vehicles [that] are subject to government regulation." *Id*. Crucially, "[t]he automobile exception does *not* contain a separate exigency requirement." *Id*. (emphasis added). Therefore, "[i]f a vehicle is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment permits police to search the vehicle without more." *Id*. Moreover, "there is no requirement that the warrantless search of a vehicle occur contemporaneously with its lawful seizure." *Id*.; *see also Texas v. White*, 423 U.S. 67, 68 (1975) ("[P]olice officers with probable cause to search an automobile at the scene where it was stopped [may] constitutionally do so later at the station house without first obtaining a warrant."). "The justification to conduct such a warrantless search does not vanish once the car has been immobilized." *Weaver*, 374 S.C. at 321, 649 S.E.2d at 482; *see also Michigan v. Thomas*, 458 U.S. 259, 261 (1982) ("[W]hen police officers have probable cause to believe there is contraband inside an automobile . . . the officers may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody.").

In determining whether the automobile exception was satisfied, "[t]he principal components of the determination of probable cause will be whether the events [that] occurred leading up to the search, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *State v. Morris*, 395 S.C. 600, 609–10, 720 S.E.2d 468, 472 (Ct. App. 2011) (quoting *State v. Brown*, 389 S.C. 473, 482, 698 S.E.2d 811, 816 (Ct. App. 2010), *rev'd on other grounds*, 401 S.C. at 82, 736 S.E.2d at 263). Probable cause exists where there is "a justifiable determination, based upon the totality of the circumstances and in view of all the evidence available . . . at the time of the search, that there exists a practical, nontechnical probability that a crime is being committed or has been committed and incriminating evidence is involved." *State v. Bultron*, 318 S.C. 323, 332, 457 S.E.2d 616, 621 (Ct. App. 1995).

Voluntary consent to search is another exception to the warrant requirement. *See State v. Pichardo*, 367 S.C. 84, 105, 623 S.E.2d 840, 852 (Ct. App. 2005) ("Warrantless searches and seizures are reasonable within the meaning of the Fourth Amendment when conducted under the authority of voluntary consent."). Once consent to search has been given, officers have the authority to seize effects after determining that there is probable cause that such effects contain evidence of a crime. *See Arizona v. Hicks*, 480 U.S. 321, 327 (1987) ("[P]robable cause [is] necessary for a seizure . . . .").

The Hyundai Sonata

Here, officers properly seized and searched the Hyundai Sonata under the automobile exception. First, Ashley was last seen entering the Hyundai Sonata with Bonilla at the Sunoco gas station. Second, Bonilla provided several inconsistent statements regarding the location where he left Ashley the night she disappeared. Third, Bonilla's mother gave several inconsistent statements regarding the location of the Hyundai Sonata. Finally, the Hyundai Sonata was found at an Enterprise Rent-A-Car, and the rental records revealed Bonilla's mother rented an alternate vehicle the day after Ashley disappeared.[15] *See United States v. Patterson*, 150 F.3d 382, 386–87 (4th Cir. 1998) (holding a vehicle believed to contain evidence of a crime may be seized if parked in public). Based on the totality of the circumstances, we find probable cause existed to search and seize the Hyundai Sonata pursuant to the automobile exception. *See Bultron*, 318 S.C. at 332, 457 S.E.2d at 621 (finding that probable cause exists where there is "a justifiable determination, based upon the totality of the circumstances and in view of all the evidence available . . . at the time of the search, that there exists a practical, nontechnical probability that a crime is being committed or has been committed and incriminating evidence is involved."); *see also Weaver*, 374 S.C. at 320, 649 S.E.2d at 482 ("If a vehicle is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment permits police to search the vehicle without more.").

Under the automobile exception, officers were not required to search the Hyundai Sonata immediately. *See Weaver*, 374 S.C. at 320, 649 S.E.2d at 482 ("[T]here is no requirement that the warrantless search of a vehicle occur contemporaneously with its lawful seizure."). Rather, officers were permitted to transport the vehicle and search it later. *See id*. at 321, 649 S.E.2d at 482 ("The justification to conduct such a warrantless search does not vanish once the car has

---

[15] We believe the acts of renting an alternate car and leaving the Hyundai Sonata at the rental car lot suggest an attempt to hide evidence from law enforcement.

been immobilized."). Therefore, once probable cause to seize the vehicle was established, officers had the authority to search the vehicle at the Dorchester County Sheriff's Office without obtaining a warrant. *See White*, 423 U.S. at 68 ("[P]olice officers with probable cause to search an automobile at the scene where it was stopped [may] constitutionally do so later at the station house without first obtaining a warrant."). Thus, any defects in the search warrant for the Hyundai Sonata would not render the search unconstitutional.

The Ford Econoline

Similarly, the officers properly seized and searched the Ford Econoline. At Cauble Flooring, officers obtained Cauble's consent to search and seize the van. *See Pichardo*, 367 S.C. at 105, 623 S.E.2d at 852 ("Warrantless searches and seizures are reasonable within the meaning of the Fourth Amendment when conducted under the authority of voluntary consent."). Additionally, after searching the van, officers had probable cause to seize it because someone was seen on camera returning the van the night after Ashley disappeared, Bonilla lied about being employed at Cauble Flooring, and the van field-tested "presumptive positive" for blood. *See Bultron*, 318 S.C. at 332, 457 S.E.2d at 621 (finding that probable cause exists where there is "a justifiable determination, based upon the totality of the circumstances and in view of all the evidence available . . . at the time of the search, that there exists a practical, nontechnical probability that a crime is being committed or has been committed and incriminating evidence is involved."). Thus, officers properly seized the van.[16] *See Hicks*, 480 U.S. at 327 ("[P]robable cause [is] necessary for a seizure . . . .").

Moreover, because the officers had probable cause and Cauble consented to the van's seizure, the officers were not required to search the van immediately. *See Weaver*, 374 S.C. at 320, 649 S.E.2d at 482 ("[T]here is no requirement that the warrantless search of a vehicle occur contemporaneously with its lawful seizure."). Rather, officers were permitted to transport the van and search it later. *See id.* at 321, 649 S.E.2d at 482 ("The justification to conduct such a warrantless search does not vanish once the car has been immobilized."). Therefore, once probable cause and consent to seize the vehicle were established, officers had the authority to search the vehicle at the Dorchester County Sheriff's Office without obtaining a warrant.

---

[16] Bonilla argues the seizure of the van exceeded Cauble's scope of consent. We find this argument meritless for two reasons. First, Cauble signed a form consenting to the seizure of "property of interest in reference to this investigation." Second, even if Cauble did not consent to the seizure, officers had authority to seize the van upon their assessment that they had probable cause to do so.

*See White*, 423 U.S. at 68 ("[P]olice officers with probable cause to search an automobile at the scene where it was stopped [may] constitutionally do so later at the station house without first obtaining a warrant."). Thus, any defects in the search warrant for the Ford Econoline would not render the search unconstitutional.

As discussed above, officers were permitted to search both vehicles without obtaining a warrant pursuant to the automobile exception. Despite such authority, officers prudently secured search warrants for both vehicles before processing them at the Dorchester County Sheriff's Office. Because officers were not required to obtain search warrants, we need not decide whether the warrants were defective. However, we will address Bonilla's contention that they were.

### b. The warrants

Bonilla argues both search warrants were defective because the vehicles, which were seized from Charleston County, were not within the jurisdiction of the Dorchester County magistrate. Bonilla further argues the search warrant for the Hyundai Sonata is defective because it is based on an affidavit containing inaccurate information. The State argues the Dorchester County magistrate properly issued the search warrants because the vehicles had already been transported to Dorchester County at the time the warrants were issued. The State further argues the search warrant for the Hyundai Sonata is proper because the underlying affidavit still supports a finding of probable cause once the inaccurate information is removed. We agree with the State.

Pursuant to section 17-13-140 of the South Carolina Code (2014), "[a]ny magistrate . . . having jurisdiction over the area where the property sought is located[] may issue a search warrant to search for and seize . . . property constituting evidence of crime or tending to show that a particular person committed a criminal offense." The task of a magistrate when determining whether to issue a warrant is to determine whether the warrant is supported by probable cause. *State v. Philpot*, 317 S.C. 458, 461, 454 S.E.2d 905, 907 (Ct. App. 1995). "A warrant is supported by probable cause if, given the totality of the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *State v. Kinloch*, 410 S.C. 612, 617, 767 S.E.2d 153, 155 (2014). Therefore, if a warrant is issued based on an affidavit containing inaccurate information, the warrant will be not be defective so long as the affidavit supports a finding of probable cause once the inaccurate information is removed. *Cf. Franks v. Delaware*, 438 U.S. 154, 156 (1978) (finding the intentional inclusion of inaccurate information in an affidavit will void the warrant if, when the false material is set to the side, the affidavit is insufficient to establish probable cause); *see also*

*State v. Davis*, 371 S.C. 413, 416, 639 S.E.2d 457, 459 ("There will be no *Franks* violation if the affidavit . . . still contains sufficient information to establish probable cause." (quoting *State v. Missouri*, 337 S.C. 548, 554, 524 S.E.2d 394, 397 (1999)).

As discussed above, both vehicles were properly seized and transported to Dorchester County before the search warrants were issued. Thus, we agree that the search warrants were properly issued by the Dorchester County magistrate. *See* S.C. Code Ann. § 17-13-140 ("Any magistrate . . . having jurisdiction over the area where the property sought is located[] may issue a search warrant to search for and seize . . . property constituting evidence of crime or tending to show that a particular person committed a criminal offense.").

Moreover, the circuit court properly found that the inaccurate information in the affidavit did not invalidate the search warrant for the Hyundai Sonata. At trial, Bonilla argued the search warrant was defective because the affidavit provided that Ashley was seen at the Sunoco gas station around 1:12 a.m., rather than 12:12 a.m. Therefore, the circuit court properly considered the remainder of the affidavit to determine whether it supported a finding of probable cause. *Cf. Franks*, 438 U.S. at 156 (finding the intentional inclusion of inaccurate information in an affidavit will void the warrant if, when the false material is set to the side, the affidavit is insufficient to establish probable cause). Upon removing the inaccurate temporal information, the affidavit still provided that: 1) Bonilla was the last known person to see Ashley; 2) Bonilla provided detectives with information that had been proven false; 3) Bonilla picked Ashley up in the Hyundai Sonata; and 4) Ashley was seen getting into the Hyundai Sonata at Sunoco. Based on the totality of the circumstances, there is evidence in the record to support the circuit court's determination that, once the inaccurate information was removed, the affidavit still supported a finding of probable cause. *See Kinloch*, 410 S.C. at 617, 767 S.E.2d at 155 ("A warrant is supported by probable cause if, given the totality of the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place.").

### III.     In camera hearing on Investigator Scott's qualifications and testimony

Preservation

Bonilla argues the circuit court erred in refusing to grant him an in camera hearing on the qualifications of Investigator Scott and the reliability of his testimony. The State argues this issue is not preserved for appeal. We agree with the State.

"In order for an issue to be preserved for appellate review, it must have been raised to and ruled upon by the [circuit court]." *State v. Dunbar*, 356 S.C. 138, 142, 587 S.E.2d 691, 693 (2003). "[Appellate courts] cannot consider issues raised for the first time on appeal." *State v. Morris*, 307 S.C. 480, 485, 415 S.E.2d 819, 822 (Ct. App. 1991). Therefore, "[i]ssues not raised and ruled upon in the [circuit] court will not be considered on appeal." *Dunbar*, 356 S.C. at 142, 587 S.E.2d at 693–94. Moreover, "[a] party may not argue one ground at trial and an alternate ground on appeal." *Id*. at 142, 587 S.E.2d at 694.

At trial, Bonilla did not object to the qualifications of Investigator Scott or the reliability of his testimony. *See Dunbar*, 356 S.C. at 142, 587 S.E.2d at 693–94 ("Issues not raised and ruled upon in the [circuit] court will not be considered on appeal."). Rather, Bonilla objected to the admission of photographs depicting several tests conducted by Investigator Scott. *See id*. at 142, 587 S.E.2d at 694 ("A party may not argue one ground at trial and an alternate ground on appeal."). In fact, the circuit court specifically asked Bonilla whether he was objecting to the admission of the photographs, and Bonilla indicated that he was. Thereafter, Bonilla did not object when Investigator Scott described how each test was conducted, when he explained that a "presumptive positive" would turn a certain color depending on the particular test, or when he indicated that stains in the van and the trunk of the Hyundai Sonata tested "presumptive positive" for blood.[17] *See id*. at 142, 587 S.E.2d at 693 ("In order for an issue to be preserved for appellate review, it must have been raised to and ruled upon by the [circuit court]."). Accordingly, this issue has not been preserved for appellate review.

Harmless Error

Even if we determined that the issue was preserved and that the circuit court erred in refusing to grant Bonilla an in camera hearing, the State argues such error would be harmless. We agree.

"Generally, appellate courts will not set aside convictions due to insubstantial errors not affecting the result." *State v. Price*, 368 S.C. 494, 499, 629 S.E.2d 363, 366 (2006). "Whether an error is harmless depends on the circumstances of the particular case." *State v. Tapp*, 398 S.C. 376, 389, 728 S.E.2d 468, 475 (2012). "Where a review of the entire record establishes the error is harmless beyond a reasonable doubt, the conviction should not be reversed." *Price*, 368 S.C. at 499, 629 S.E.2d at 366. "Thus, an insubstantial error not affecting the result of the trial

---

[17] Notably, Bonilla conducted a voir dire of the State's expert in bloodstain pattern analysis but did not ask to conduct a voir dire of Investigator Scott.

is harmless where guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached." *Id.*

We find any error in failing to grant Bonilla an in camera hearing would be harmless under two rationales. First, Investigator Scott's testimony is cumulative to Agent Meeh's testimony. Investigator Scott testified that several samples taken from the seized vehicles tested "presumptive positive" for the presence of blood. Agent Meeh then testified, without objection, that the samples contained human blood, further providing that the blood matched Ashley's DNA. Thus, Investigator Scott's testimony regarding the "presumptive positive" tests is cumulative and therefore harmless. *Cf. State v. Jennings*, 394 S.C. 473, 478, 716 S.E.2d 91, 93–94 (2011) ("Improperly admitted hearsay [that] is merely cumulative to other evidence may be viewed as harmless.").

Second, any error in failing to determine Investigator's Scott's qualifications and the reliability of his testimony would be harmless when considering the overwhelming evidence of Bonilla's guilt. The evidence in the record shows that 1) Bonilla admitted to killing Ashley; 2) Bonilla took steps to cover up Ashley's killing; 3) Ashley's cause of death was homicidal violence; 4) several stains from the van and the trunk of the Hyundai Sonata tested positive for Ashley's blood; 5) Ashley was found nude from the waist down with her shirt and bra around her upper chest; 6) Ashley's body was discovered with electrical tape around her neck and electrical tape resembling handcuffs around her wrist; 7) the lack of tissue and internal organs around Ashley's buttocks and vaginal area suggested injury; 8) Ashley's body tested positive for the presence of a muscle relaxer; 9) a tube of personal lubricant was removed from the van; and 10) Bonilla gave several inconsistent statements to law enforcement and Ashley's family. Accordingly, we find that Bonilla's guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached. Therefore, any error would be harmless beyond a reasonable doubt.

## CONCLUSION

Based on the foregoing, Bonilla's conviction is

**AFFIRMED.**

**SHORT and THOMAS, JJ., concur.**